IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SCOTT K. GINSBURG, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CASE NO. 3:13-cv-952 |
| GEORGETOWN UNIVERSITY, | § § § | |
| Defendant. | § § | |

## ORIGINAL COMPLAINT

Plaintiff Scott Ginsburg ("Ginsburg") files this Original Complaint against Defendant Georgetown University ("Georgetown"), and respectfully shows as follows:

### I.   PARTIES

1.   Plaintiff Scott K. Ginsburg is a citizen of the State of Texas.

2.   Defendant Georgetown University is a District of Columbia sole proprietorship with its principal place of business at 3700 O St NW, Washington, DC 20057. Georgetown may be served with process by delivery to Lisa E. Krim, its Vice President & General Counsel, at 37th & O Street, NW 202 Healy Hall, Washington, DC, 20057.

### II.   JURISDICTION AND VENUE

3.   This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a) because Plaintiff is a citizen of Texas, Defendant is a citizen of the District of Columbia, and the amount in controversy exceeds $75,000.00.

4. This Court has specific personal jurisdiction over Georgetown because it sent a representative to Texas to solicit Ginsburg as a donor to its law school; developed an ongoing personal relationship with him in Texas over many years, during which Georgetown repeatedly sent representatives and communications to Texas to cultivate him as a donor; contracted with him in Texas about the terms of charitable donations; and during the course of their relationship, made affirmative misrepresentations in Texas to Ginsburg that he relied upon in choosing to give Georgetown millions of dollars. Ginsburg's claims in this lawsuit arise directly from all of the foregoing actions in and contacts with Texas by Georgetown.

5. This Court has general personal jurisdiction over Georgetown because of its systematic and continuous contacts with Texas at all relevant times. Among other actions, Georgetown transacted and continues to transact business in Texas by recruiting applicants, soliciting donations, and conducting alumni relations functions. These activities are merely illustrative of Georgetown's myriad contacts with Texas.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

### III. FACTUAL BACKGROUND

**A. Ginsburg Generously Agreed to Donate $5,000,000 to Georgetown in Return for Naming Rights to the Scott K. Ginsburg Health and Fitness Center.**

7. Ginsburg attended the Georgetown University Law Center (the "Law Center") as an evening student, working during the day as a staff director for two U.S. Senate subcommittees, and graduated with a Juris Doctorate in 1978. He became a successful businessman, founding and running several companies in the media industry.

8. Kevin Conry, the Vice President of Strategic Development and External Affairs and Associate Dean of External Affairs of the Law Center, came to Dallas, Texas to solicit

donations to the Law Center from Ginsburg and others in late 1999 and early 2000. Ginsburg met with Conry in Texas several times to discuss Georgetown's development plans for the Law Center, including a prospective sport and fitness center, and Ginsburg's possible involvement in those plans through a monetary gift to the university. Conry represented to Ginsburg in these meetings that Georgetown was interested in naming the prospective sport and fitness center after a benefactor who contributed a sufficient donation for its construction.

9. Ginsburg decided to make a large donation to his alma mater for the construction of the sports and fitness facility. As Ginsburg later described his reasons for donating: "Remembering my own experience at Georgetown, I wanted to contribute to the quality of students' lives there. Recreation and fitness are an important part of law school life, and I'm proud to be able to play this part in expanding the Law Center's facilities. I hope my gift will inspire other alumni to support the Law Center." Exhibit B (September 2000 Press Release).

**B.   Georgetown and Ginsburg Executed a Contract Reflecting Their Agreement.**

10. On March 30, 2000, Georgetown and Ginsburg entered into an Agreement (the "Agreement") by which Ginsburg pledged to donate $5,000,000 to Georgetown for the construction of a fitness center at the Georgetown University Law Center. Exhibit A (Agreement). The Agreement also granted Ginsburg naming rights to the fitness center, stating clearly: "The Fitness Center shall be named the "Scott K. Ginsburg Health and Fitness Center (the "Name")." Id. ¶ 8(a).

11. Georgetown also agreed that "[t]he Name shall be prominently etched and displayed above the main entrance of the Fitness Center in a manner (and with similar boldness, prominence, and importance) similar to that of the Edward Bennett Williams Law Library, the Bernard S. & Sarah M. Gewirz Student Center, and Bernard P. McDonough Hall." Id. ¶ 8(b).

12. Georgetown also agreed that "[a]ppropriate recognition of [Ginsburg] shall be place inside the Fitness Center, in one or more prominent locations, one of which may include a mutually agreeable description and photo-portrait of [Ginsburg]." *Id.* ¶ 8(c).

13. Georgetown also agreed that "[Georgetown] shall utilize [Ginsburg's] full name ("Scott K. Ginsburg") whenever and wherever the Fitness Center is described or referenced. Without limitation, [Georgetown] shall utilize the full Name in campus signage, brochures and bulletins, promotional literature, Fitness Center membership solicitations, and in correspondence and communications about the Fitness Center. ([Georgetown] acknowledges that its obligation to comply materially with this condition *is of the essence of this Agreement* . . . ." *Id.* ¶ 8(d) (emphasis added).

14. On September 1, 2000, Georgetown issued a press release announcing the future construction of the Scott K. Ginsburg Health and Fitness Center. The press release states: "Ginsburg has pledged $5 million for a sports and fitness facility that will bear his name. The Scott K. Ginsburg Health and Fitness Center will be designed to provide state-of-the-art athletic, health, fitness and recreational facilities for GULC students, faculty and staff." Exhibit B (September 2000 Press Release).

C.   **Georgetown Continued to Solicit Donations from Ginsburg.**

15. Over the next ten years, Conry continued to visit Ginsburg in Texas to solicit and encourage further donations. Conry was accompanied at times by John DeGioia, the President of Georgetown University; Judith Areen, the Dean of Georgetown Law Center at the time the agreement was executed and the fitness center was built; and Alex Aleinikoff, who succeeded Areen as the Dean of Georgetown Law Center. In fact, Aleinikoff visited Ginsburg at his home in Dallas after Ginsburg's son was born, bringing Georgetown baby clothes as a gift to Ginsburg.

16. After one such visit in December 2001, President DeGioia sent Ginsburg a thank you letter thanking him for "opening your beautiful home to me." He also thanked Ginsburg for his "leadership gift to the Law Center. The Scott K. Ginsburg Sport and Fitness Center will enhance student life for generations to come. Thank you, too, for being willing to consider increasing your gift. . . . I have asked Kevin Conry to send you the projected operational costs for the Sports and Fitness Center. Should you decide to augment your gift, perhaps we could put it towards endowing the operational costs of the Center." Exhibit C (12/28/01 JJD Letter to SKG). President DeGioia visited Dallas several more times on university business to solicit donations, including a speaking engagement with Georgetown alumni at Brookhollow Country Club at which he sat with Ginsburg.

17. Despite DeGioia's praise of Ginsburg while soliciting additional donations in 2001, in addition to his repeated and continuous solicitation of Ginsburg over the next ten years including a 2009 letter thanking Ginsburg for his "recent, generous payment to support the Scott K. Ginsburg Sport & Fitness Center at Georgetown University Law Center" and other communications as late as 2010, DeGioia would tell Ginsburg in 2013 that he had no recollection of these events or Ginsburg's naming rights. *See* Exhibit D (3/24/09 JJD Letter to SKG)

**D. Ginsburg Encountered Legal Issues Unrelated to His Relationship with Georgetown.**

18. Before Ginsburg entered into the Agreement and during the time that Georgetown officials were traveling to Dallas to solicit his donations, the SEC began a civil action against Ginsburg for allegedly disclosing material non-public information to his father and brother. Ginsburg was fully candid with Georgetown about this legal issue prior to the Agreement. At the time Georgetown was first courting him as a donor, it assured him that this situation was not a problem for the university and went ahead with the Agreement. Indeed, Georgetown never

expressed any concern about Ginsburg's issues with the SEC during their initial pursuit of him and during the preparation of the Agreement.

19. In 2002, the SEC pursued the charges against Ginsburg at trial. After trial, the court entered a judgment against Ginsburg. He appealed.

### E. Georgetown Attempted to Amend the Agreement, but Ginsburg Refused.

20. On May 2, 2002, Dean Areen sent a letter to Ginsburg in Texas. Exhibit E (5/2/02 JA Letter to SKG and Attachment). Though Georgetown had shown no hesitation to continue soliciting Ginsburg's donations despite his legal issues, the letter requested that Ginsburg sign an amendment to the 2000 Agreement and relinquish naming rights to the fitness center. In the letter Areen states, "if the jury verdict is overturned . . . I intend to go immediately to the Board for approval to name the building for you. In the meantime, we will find lots of ways to honor your gift without generating negative media coverage." *Id.* The proposed amendment stated that "[Ginsburg] and [Georgetown] agree to delete in its entirety paragraph 8(a)-(d) entitled 'Naming Rights' from the Agreement" and substitute that paragraph with one promising that GU will provide "Appropriate recognition of [Ginsburg] . . . placed inside the Fitness Center, in one or more locations, one of which may include a mutually agreeable description and photo-portrait of SKG." *Id.*

21. Ginsburg refused to sign the proposed amendment, and it was never executed.

### F. Georgetown Continued to Solicit Donations from Ginsburg Representing That They Would Honor His Naming Rights as They Had Agreed.

22. Ginsburg's refusal to amend the Agreement and relinquish the naming rights to which Georgetown originally agreed did not stop Georgetown officials from promoting Ginsburg's gift for fundraising purposes. Indeed, in 2002 Georgetown inducted Ginsburg into its "1776 Club" for noted alumni and donors. The induction announcement proclaimed: "Mr.

Ginsburg's gift will fund the Scott K. Ginsburg Sport and Fitness Center on the Law Center campus . . . The Scott K. Ginsburg Sport and Fitness Center is a vital element of the Law Center Campus Completion Project . . . ." Exhibit F (1776 Club Announcement).

23. Nor did Ginsburg's refusal to amend the Agreement stop Georgetown officials from continuing to travel to Texas to solicit further donations from Ginsburg. *See, e.g.*, Exhibit G (7/2 and 7/3 Fax Cover Sheets). In the wake of Dean Areen's proposed amendment to the Agreement and in an effort to secure more donations from Ginsburg, however, Georgetown officials expressly represented to Ginsburg that they would, indeed, ultimately honor their Agreement and grant Ginsburg full naming rights to the Scott K. Ginsburg Sport and Fitness Center – specifically, Dean Areen and Conry came to Texas and made such assurances to Ginsburg in person in July 2003.

24. Due to the assurances of top Georgetown officials that Ginsburg's generosity would be recognized as Georgetown had agreed, his commitment to the school continued and grew. On June 27, 2003 he entered into a "Gift Agreement" with Georgetown, in which he pledged to donate an additional $11,000,000 as the culmination of sustained, intense efforts by Georgetown to draw Ginsburg into the Georgetown community as a prominent and valued alumnus. Exhibit H (Gift Agreement). Ginsburg was invited to join the Georgetown Board of Visitors, welcomed to university functions, invited on university trips, and generally embraced by the university, all with the goal of extracting ever more money from him. The Gift Agreement also integrated Ginsburg's remaining payments under the earlier Agreement, while not modifying any obligations under that Agreement. *Id.* Ginsburg entered this Agreement based on the express assurances from Georgetown officials that his naming rights in the Agreement would be honored.

25. Georgetown sent Ginsburg a receipt for an installment of his donation made on September 19, 2003. Exhibit I (Receipt). The receipt notes Ginsburg's most recent payment under the agreements, allocated to the "Scott K. Ginsberg [sic] Sport & Fitness Center." *Id.*

26. Conry, Aleinikoff, and DeGioia continued to travel to Texas and solicit donations from Ginsburg. On a regular basis, one or a combination of those individuals came to visit Ginsburg in Texas, and on each occasion, would continue to assure him that Georgetown would honor its Agreement to grant Ginsburg his naming rights to the Scott K. Ginsburg Sport & Fitness Center.

27. In 2006, Georgetown published an updated version of its "1776 Club" announcements. Again, the republication proclaimed: "Mr. Ginsburg's gift will fund the Scott K. Ginsburg Sport and Fitness Center on the Law Center campus . . . The Scott K. Ginsburg Sport and Fitness Center is a vital element of the Law Center Campus Completion Project . . . ."

28. Georgetown officials continued to assure Ginsburg that the fitness center would be named after him and that his name would be displayed as stated in the Agreement. On January 11, 2009, Ginsburg received a Letter from Dean Aleinikoff stating that it "was a pleasure to receive [Ginsburg's] recent pledge payment" to the "Scott K. Ginsburg Sport & Fitness Center at Georgetown University Law Center." Exhibit J (1/11/09 TAA Letter to SKG). On March 24, 2009, Ginsburg received a letter from President DeGioia thanking him for his "recent, generous payment to support the Scott K. Ginsburg Sport & Fitness Center at Georgetown University Law Center." Exhibit D (3/24/09 JJD Letter to SKG).

29. In fact, at no time in the relationship between Ginsburg and Georgetown did Georgetown officials ever say, unequivocally, that they would not be living up to the Agreement, or that they will not put his name on the "Sport and Fitness Center." The possibility of

Georgetown finally honoring its obligations was hinted at, implied, suggested, and postponed by its representatives' comments, but always kept alive. Indeed, the building was not named for anyone else and carried no other door's name. Georgetown also never offered, let alone agreed, to refund Ginsburg's money to him, despite Georgetown's failure to comply with the Agreement.

### G.  Georgetown Fails to Honor its Agreement with Ginsburg.

30. Despite Georgetown's continued assurances – and Ginsburg's continued donations – Georgetown did not name the center for Ginsburg. On March 5, 2010, Ginsburg sent an email to Conry expressing his displeasure with Georgetown's delay in performing its commitments to him under the Agreement. Exhibit K (3/5/10 SKG Email to KC). In this letter and follow-up conversations with Georgetown officials, Ginsburg demanded that Georgetown fully perform. Months of ineffective communication culminated in a meeting between Ginsburg and President DeGioia in person in February of 2013. At this meeting, DeGioia told Ginsburg that "you will be mad at me but I do not have any recollection" of their correspondence or Georgetown's commitments to Ginsburg about naming the center.

31. His options exhausted, Ginsburg files this suit to seek redress from Georgetown. It is now apparent that since 2002, Georgetown not only was not in fact committed to recognizing Ginsburg's generosity by naming the sports center for him, but each of the foregoing oral and written representations to him about its claimed commitment was false, made only to entice him to give Georgetown more money. In reliance on Georgetown's false representations and manipulation, Ginsburg donated a total of at least $7.5 million to Georgetown, including his completed original $5,000,000 pledge in the Agreement.

32. Ginsburg has asserted his claims against Georgetown within any applicable limitations periods, as Georgetown has still never admitted that it will not name the center for him but simply stopped giving false assurances in solicitation of Ginsburg's further generosity

and no longer refer to the facility as the Scott K. Ginsburg Sport and Fitness Center. Alternatively, any limitations period was tolled because the nature of the injury was not discoverable (as only Georgetown knew of its real intentions), because Georgetown fraudulently concealed its true intentions from Ginsburg, and because Georgetown is equitably estopped from invoking the statute of limitations after an intentional and sustained campaign of misrepresentations toward Ginsburg.

### IV.  CAUSES OF ACTION

#### FIRST CAUSE OF ACTION
#### BREACH OF CONTRACT

33.  Ginsburg repeats and re-alleges all of the paragraphs above and below as though fully set forth herein.

34.  A contract existed between Ginsburg and Georgetown. By the terms of the Agreement, Georgetown agreed to grant Ginsburg naming rights to the Scott K. Ginsburg Sport & Fitness Center. In return, Ginsburg agreed to donate $5,000,000 to Georgetown for the purpose of building the Scott K. Ginsburg Sport & Fitness Center.

35.  Georgetown's actions and omissions, including but not limited to those actions described above, have breached the agreements between the parties.

36.  Ginsburg has fulfilled all of his contractual obligations in all material respects.

37.  As a result of Georgetown's breach, Ginsburg suffered harm and seeks recovery of his damages and restitution of the benefit he conferred upon Georgetown in reliance on its commitment. Pursuant to the Texas Civil Practice and Remedies Code, Ginsburg also seeks recovery of his reasonable and necessary attorney's fees and expenses incurred in prosecution of this action.

## SECOND CAUSE OF ACTION
## FRAUD/FRAUDULENT INDUCEMENT

38. Ginsburg repeats and re-alleges all of the paragraphs above and below as though fully set forth herein.

39. As detailed above, Georgetown made material representations to Ginsburg that were false.

40. When Georgetown made the representations, Georgetown knew the representations were false or made the representations recklessly, as positive assertions, and without knowledge of their truth. Georgetown also promised future conduct with no intention to perform. Georgetown intended to induce Ginsburg to make further donations to the university and to enter into agreements about donations based on the false representations.

41. Ginsburg relied on Georgetown's false representations in making further donations to the university. Ginsburg also entered into agreements based on Georgetown's false representations.

42. The false representations caused Ginsburg injury.

43. Ginsburg seeks recovery of all damages caused to him by Georgetown's fraud, including restitution of the funds obtained from him by misrepresentation.

## THIRD CAUSE OF ACTION
## RESTITUTION

44. Ginsburg repeats and re-alleges all of the paragraphs above and below as though fully set forth herein.

45. Ginsburg conferred a benefit upon Georgetown in the amount of at least $7.5 million. .

46. Georgetown had an appreciation and knowledge of this benefit and in fact solicited the benefit.

47. Georgetown wrongfully secured or passively received the benefit.

48. It is unconscionable for Georgetown to now retain the benefit.

49. Ginsburg seeks recovery of at least $7.5 million as the full amount of Georgetown's unjust enrichment.

### V. JURY DEMAND

50. Ginsburg demands a trial by jury on all issues.

### VI. PRAYER

51. Ginsburg requests the following relief:

   a. Actual, compensatory, and restitution damages;

   b. The reasonable and necessary attorneys' fees and expenses incurred through the trial of this cause and through any appeal of this action, including but not limited to expert witness fees and expenses;

   c. Interest at the legal rate allowed by law prior to judgment, and after judgment interest at the legal rate allowed by law until paid;

   d. Costs of suit;

   e. Such other and further relief, both special and general, at law or in equity, to which Ginsburg may be justly entitled.

DATED: March 4, 2013

Respectfully submitted,

_____
John T. Cox III
State Bar No. 24003722
David S. Coale
State Bar No. 00787255
Nicholas J. Chapleau
State Bar No. 24069494
**LYNN TILLOTSON PINKER & COX, L.L.P.**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 Telephone

(214) 981-3839 Facsimile

**ATTORNEYS FOR PLAINTIFF
SCOTT K. GINSBURG**

4852-3339-5987, V. 3