# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| SCOTT K. GINSBURG, <br><br>        Plaintiff, <br><br>   v. <br><br> GEORGETOWN UNIVERSITY, <br><br>        Defendant. | Civil Action No. 3:13-CV-00952-L |

## BRIEF IN SUPPORT OF DEFENDANT GEORGETOWN UNIVERSITY'S MOTION TO TRANSFER

William D. Nussbaum
D.C. Bar No. 941815
Joel D. Buckman
D.C. Bar No. 1003868
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
william.nussbaum@hoganlovells.com
joel.buckman@hoganlovells.com

*Of counsel*

Bruce  D. Oakley
State Bar No. 15156900
HOGAN LOVELLS US LLP
700 Louisiana Street
Suite 4300
Houston, TX 77002
Tel: (713) 632-1400
Fax: (713) 632-1401
bruce.oakley@hoganlovells.com

*Counsel for Defendant*
*Georgetown University*

April 9, 2013

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ................................................ 2

THE COURT SHOULD GRANT THE MOTION TO TRANSFER ........................................... 6

    A.    The Private Interest Factors Support Transfer .................................................. 7

        1.    The relative ease of access to sources of proof supports transfer ................................. 8

        2.    The availability of compulsory process to secure attendance of witnesses is neutral ... 9

        3.    The costs of attendance for willing witnesses supports transfer ................................... 9

    B.    The Public Interest Factors Support Transfer ................................................. 12

        1.    Relative court congestion supports transfer ................................................................. 13

        2.    The local interests in deciding localized disputes at home supports transfer .............. 13

        3.    Familiarity of the forum with the law that will govern is neutral ................................ 17

CONCLUSION .................................................................................................................. 17

## TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Busch v Robertson*,
No. 3:05-CV-2043-L, 2006 WL 1222031 (N.D. Tex. May 5, 2006) .............................. *passim*

*Doe v. Corp. of The Ass'n of the Presiding Bishop of
The Church of Jesus Christ of Latter-Day Saints*,
08-CV-371-SU, 2009 WL 2132722 (D. Or. July 10, 2009) ....................................................16

*Environmental, Safety & Health Consulting Services,
Inc. v. Magnablend, Inc.*, No. CIV.A. 12-1751,
2012 WL 5493744 (E.D. La. Nov. 13, 2012) ........................................................................14

*Frederick v. Advanced Financial Solutions, Inc.*,
558 F. Supp. 2d 699 (E.D. Tex. 2007)....................................................................................14

*Gootnick v. Lighter*,
No. C 05-02787 SI, 2005 WL 3079000 (N.D. Cal. Nov. 16, 2005) ........................................12

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947)................................................................................................................14

*Gundle Lining Construction Corp. v. Fireman's Fund Insurance Co.*,
844 F. Supp. 1163 (S.D. Tex. 1994) ........................................................................................7

*Hernandez v. Graebel Van Lines*,
761 F. Supp. 983 (E.D.N.Y. 1991) ........................................................................................10

*In re Volkswagen of America, Inc.*,
545 F.3d 304 (5th Cir. 2008) ........................................................................................ *passim*

*Kirschner Bros. Oil, Inc. v. Pannill*,
697 F. Supp. 804 (D. Del. 1988)............................................................................................11

*Koehring Co. v. Hyde Construction Co.*,
324 F.2d 295 (5th Cir. 1963) ................................................................................................14

*LeBouef v. Gulf Operators, Inc.*,
20 F. Supp. 2d 1057 (S.D. Tex .1998) ......................................................................................8

*Sabre Technologies, L.P. v. TSM Exhibits, Inc.*,
3:09-CV-0392-L, 2010 WL 3855316 (N.D. Tex. Sept. 29, 2010) ........................................15

*Sargent v. Sun Trust Bank, N.A.*,
No. Civ.A. 3:03-CV-2701-., 2004 WL 1630081 (N.D. Tex. July 20, 2004)............................9

*SEC v. Ginsburg*,
   362 F.3d 1292 (11th Cir. 2004) .......................................................................4

*Sierra Club v. Flowers*,
   276 F. Supp. 2d 62 (D.D.C. 2003) .............................................................14, 16

*Stratmark, Ltd. v. Cross Mediaworks, Inc.*,
   3:10-CV-0780-L, 2010 WL 5106442 (N.D. Tex. Dec. 14, 2010) ....................11, 13

*TGI Friday's Inc. v. Great Northwest Restaurants, Inc.*,
   652 F. Supp. 2d 750 (N.D. Tex. 2009) ............................................................16

*U.S. ex rel. Thomas v. Siemens AG*,
   No. 1:04-CV-116, 2009 WL 1657429 (D.V.I. June 12, 2009) .............................16

*Wells Fargo Bank NA v. Bank of America NA*,
   No. 3:10–CV–1825–L., 2010 WL 5287538 (N.D. Tex. Dec. 23, 2010) ........8, 9, 10

## STATUTES:

28 U.S.C. § 1391(b) .........................................................................................7

28 U.S.C. § 1404(a) ...................................................................................1, 6, 7

# INTRODUCTION

Under 28 U.S.C. § 1404(a), defendant Georgetown University ("Georgetown" or the "University") moves to transfer this lawsuit to the United States District Court for the District of Columbia. This case is about two gift agreements negotiated in 2000 and 2003, at least one of which was negotiated in the District of Columbia between Georgetown and plaintiff Scott K. Ginsburg's Washington, D.C. lawyer. The gift agreements memorialize financial pledges by Mr. Ginsburg specifically for the construction of a building and a clock tower (along with funds to be used for other things) on the Washington, D.C. campus of the Georgetown University Law Center for the benefit of the Law Center's students, faculty, and staff.

In deciding whether to transfer a case to another district, the Court often considers the relative ease of access to sources of proof, the availability of compulsory process to compel non-party witnesses, the convenience of willing witnesses, relative court congestion, the interest in having local disputes tried locally, and relative familiarity with governing law. As discussed below, all but two of those factors support transfer to the District of Columbia, two of them are neutral at best, and none supports retaining the case in the Northern District of Texas. With the exception of Mr. Ginsburg, nearly everyone and everything relevant to this dispute is in or near Washington, D.C., including Georgetown and the Law Center facility at issue, nearly all of the witnesses, and nearly all of the documents and other sources of proof, not to mention the Law Center community which has benefited from Mr. Ginsburg's gift. There can be no question that transfer would clearly serve both the convenience of the parties and the public interest, and the Court should order the case transferred.

1

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On March 4, 2013, Scott K. Ginsburg—a 1978 graduate of the Georgetown University Law Center, a member of its Board of Visitors since 2000, and for many years an avid financial supporter of the University—sued Georgetown University seeking the return of all the money he has donated under financial pledge agreements he signed in 2000 and 2003, which he alleges totals approximately $7.5 million.  (*See* Compl. ¶¶ 7, 31.)  Mr. Ginsburg has alleged three causes of action: breach of contract, fraud, and restitution.  (*Id.* ¶¶ 33–49.)  All of Mr. Ginsburg's claims stem from the fact that Georgetown has not named a building on its Law Center campus for him despite allegedly agreeing to do so in return for a donation.  (*E.g.*, *id.* ¶ 31.)  Georgetown has filed an Answer and a Counterclaim seeking payment on donor pledges Mr. Ginsburg made to Georgetown but has failed to fulfill, and now moves to transfer the entire case to the District of Columbia, which is a more appropriate venue.

On March 30, 2000, Mr. Ginsburg and Georgetown University signed a gift agreement (the "2000 Agreement").  (Countercl. ¶ 16.)  Although Mr. Ginsburg initially discussed some of the general terms of the gift with representatives of Georgetown in Texas, the details of the arrangement, and the 2000 Agreement itself, were negotiated in Washington, D.C. by his attorney and representatives of the University.  (*Id.*) Under the 2000 Agreement, Mr. Ginsburg pledged $5 million to the University to be used for the construction of a Sport and Fitness Center on the Law Center's campus.  (*Id.* ¶ 17.)  The pledge was conditioned on Georgetown's naming the building the "Scott K. Ginsburg Sport and Fitness Center."  (*Id.*)

With the 2000 Agreement, Mr. Ginsburg commenced a robust relationship with the University.  (*Id.* ¶ 21.)  He joined the Law Center's Board of Visitors in 2000.  His daughter entered the University as an undergraduate in 2002.  (*Id.*)  In 2006, she followed her father's

footsteps and enrolled at the Law Center.  (*Id.*)  Beginning in 2000, Mr. Ginsburg met often with Georgetown officials, including all of the officials named in the Complaint.  The vast majority of those meetings took place in the District of Columbia.  (*See, e.g.*, App. at 4–5, Decl. of A. Aleinikoff ¶ 4; *id.* at 7–8, Decl. of J. Areen ¶ 3; *id.* at 9–10, Decl. of K. Conry ¶ 4.)  As the attached declarations reflect, since 2000, Mr. Ginsburg has met in the District of Columbia with just these three declarants at least nine times to discuss a broad array of topics relating to the University and Mr. Ginsburg's role as a donor and member of the Board of Visitors.  This of course does not include meetings that Mr. Ginsburg had during that period in the District of Columbia with other Georgetown employees.

The 2000 Agreement called for Georgetown to refer to the Sport and Fitness Center as the "Scott K. Ginsburg Sport and Fitness Center."  There is no dispute that, during the subsequent two year period when the facility was in its planning and early construction stages, Georgetown intended to comply with this provision.  (*See, e.g.*, Compl. ¶ 31.)  But in April 2002, following trial in the United States District Court for the Southern District of Florida of a civil case brought by the United States Securities and Exchange Commission, a jury found Mr. Ginsburg liable for insider trading.  (*See* Countercl. ¶ 23.)  Georgetown Law Center Dean Judith Areen learned of the verdict in a newspaper article later in April 2002.  (*Id.* ¶ 24.)  Dean Areen was understandably concerned about naming a prominent new building on the Law Center's campus after someone who had been found to have violated the law.  (*Id.* ¶ 25.)

After consulting promptly with her colleagues, Dean Areen called Mr. Ginsburg and told him that the University would be unable to name the Sport and Fitness Center for him in light of the verdict.  (*See id.* ¶¶ 25–26.)  Dean Areen offered to return Mr. Ginsburg's money and cancel his pledge.  (*Id.*)  Mr. Ginsburg declined the offer.  He said he wanted to go forward whether or

not the building was named for him.  He told Dean Areen he believed in the project and did not

want his legal troubles to affect the Law School, which had relied on his pledge.  (*Id.* ¶ 27.)  He

also said he believed the verdict against him would be overturned.  Dean Areen told Mr.

Ginsburg that Georgetown would revisit the question of naming the Sport and Fitness Center for

him only in the event that the verdict was overturned.  (*Id.*)  The parties agreed that unless and

until that happened, however, Georgetown would not name the Sport and Fitness Center the

"Scott K. Ginsburg Sport and Fitness Center."  (*Id.*)

In early 2003, after surviving a serious automobile accident which left Mr. Ginsburg

feeling that he had been given a second chance, he decided to increase his philanthropic

commitment to Georgetown.  (*Id.* ¶ 34.)  Mr. Ginsburg called Dean Areen at her Washington,

D.C. office, asked her to identify the amount of the largest single gift the Law Center had ever

received, and told her he wanted to make a donation that exceeded that amount.  (*See id.* ¶ 35.)

Mr. Ginsburg ultimately pledged to Georgetown an additional $11 million—$6 million to

support the Campus Completion project and to erect a clock tower on the Law Center's campus,

and $5 million to the President of the University to use in his discretion.  This 2003 pledge was

memorialized in an agreement dated June 27, 2003.  ("The 2003 Agreement") (*Id.* ¶ 37.)

Meanwhile, Mr. Ginsburg's insider trading case continued.  In late 2002, the District

Court granted Mr. Ginsburg's motion and entered a judgment notwithstanding the verdict.  The

SEC appealed the District Court's ruling to the Eleventh Circuit.  (*Id.* ¶ 32.)  In March 2004, the

Eleventh Circuit reversed the JNOV and reinstated the verdict against Mr. Ginsburg.  *See SEC v.

Ginsburg*, 362 F.3d 1292 (11th Cir. 2004).  Mr. Ginsburg elected to pursue no further appeals,

and ultimately was ordered to pay a civil penalty of $1 million and was permanently enjoined

from engaging in conduct that violates the securities laws of the United States.  (Countercl. ¶ 39.)

Later in 2004, the Sport and Fitness Center was completed. (*Id.* ¶ 40.) Because the insider trading verdict against Mr. Ginsburg was then final—and consistent with what Dean Areen had told Mr. Ginsburg when they first discussed the issue in April 2002—Georgetown never reversed its decision not to name the Sport and Fitness Center for him. (*Id.* ¶ 40–42.) Mr. Ginsburg did not object. To the contrary, he attended the grand opening celebration for the new facility in September 2004. (*Id.*) At the celebration, Georgetown heaped praise on Mr. Ginsburg for his donation. (*Id.*) At a Recognition Ceremony held in his honor, Mr. Ginsburg addressed the assembled guests. A plaque bearing Mr. Ginsburg's name and a large portrait of him were placed in the entranceway to the Sport and Fitness Center (where they remain today) to make clear that his generosity had made the building possible. (*Id.*) But Mr. Ginsburg's name did not appear on the exterior of the building as had been envisioned at the time he made his original donation. (*Id.*) Instead, the building was called "Sport and Fitness Center." (*Id.*) That is what it is called today. (*Id.*)

From at least 2004 until February 2013, Mr. Ginsburg never expressly requested either formally or informally that the Law Center name the building for him, a requirement which the University understood no longer to exist. (*Id.* at 43–44.) No Georgetown official ever made any representation to Mr. Ginsburg that the building would be named for him. (*See* Answer ¶¶ 24, 26, 28.) Nevertheless, the relationship between Georgetown and Mr. Ginsburg continued to be positive and productive. (Countercl. ¶ 43.) Mr. Ginsburg continued to serve on the Law Center Board of Visitors—a position he holds to this day—and continued to make pledges and donations to the Law Center, including the $11 million pledge he made in 2003 and another $1 million donation he made in October 2006 to help the Law Center purchase certain real property adjacent to campus. (*See* Countercl. ¶ 43.) Mr. Ginsburg was a frequent visitor to Washington,

D.C., and even owned property in Washington, D.C. near the Georgetown University campus from 2006 until 2010. (*See* App. at 4–5, Decl. of A. Aleinikoff ¶ 4; *id.* at 7–8, Decl. of J. Areen ¶ 3; *id.* at 9–10, Decl. of K. Conry ¶ 4; Countercl. ¶ 10.)

In February 2013, Mr. Ginsburg requested and received a meeting with Georgetown's President in Washington, D.C. (*See id.* ¶ 44.) At the meeting, Mr. Ginsburg raised out of the blue the issue of the Sport and Fitness Center having not been named for him. (*See id.*) The next month—almost thirteen years after entering into the 2000 Agreement, eleven years after being told that the University would not name the Sport and Fitness Center for him, ten years after he decided to pledge an additional $11 million to Georgetown, nine years after the insider trading verdict against him became final, and nine years after he attended the dedication of a Sport and Fitness Center facility that was not named for him—Mr. Ginsburg sued the University. (*See id.* ¶¶ 16, 26, 37, 39, 40–41.) Mr. Ginsburg seeks to recover not just his initial donation of $5 million, but approximately $2.5 million he paid towards the $11 million pledge he made in 2003, on which he still owes approximately $9 million. (Compl. ¶ 31.) On April 9, 2013, Georgetown filed an Answer as well as a Counterclaim for the balance of the 2003 pledge. (*E.g.*, Countercl. ¶ 8.)

## THE COURT SHOULD GRANT THE MOTION TO TRANSFER

Under 28 U.S.C. § 1404(a), a District Court may transfer any civil action to any other district or division where it might have been brought "[f]or the convenience of parties and witnesses, in the interests of justice." The decision to transfer is left to the sound discretion of the District Court. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 311–12 (5th Cir. 2008). A plaintiff's choice of forum—though not unimportant—does not carry the heavy and often decisive weight it once carried under the common law *forum nonconveniens* doctrine. *See id.* at

314–15; *see also Gundle Lining Constr. Corp. v. Fireman's Fund Ins. Co.,* 844 F. Supp. 1163, 1165 (S.D. Tex. 1994).   Rather, under § 1404(a), a court should exercise its discretion and grant a transfer upon a showing of "good cause" by the movant "clearly demonstrat[ing] that a transfer is '[f]or the convenience of parties and witnesses, in the interest of justice.'"   *Volkswagen,* 545 F.3d at 315 (quoting 28 U.S.C. § 1404(a)).   The determination of convenience turns on a number of private and public interest factors, none of which is given decisive weight.   *Id.*; *Busch v Robertson*, No. 3:05-CV-2043-L, 2006 WL 1222031, *4 (N.D. Tex. May 5, 2006) (unpublished).

Georgetown requests a transfer to the United States District Court for the District of Columbia, where this suit could have been brought because Georgetown is the only defendant and is incorporated there.   *See* 28 U.S.C. § 1391(b).   As explained in greater detail below, the relative ease of access to sources of proof, the availability of compulsory process for unavailable witnesses, the convenience of willing witnesses, docket congestion, the fundamentally local character of this dispute, and the D.C. District Court's familiarity with governing law support a transfer (or are neutral).   With the exception of Mr. Ginsburg, nearly everything relevant to this local dispute is in or near the less congested Washington, D.C. forum—the building at issue, the documents and other sources of proof, nearly all of the likely witnesses, and the beneficiaries of Mr. Ginsburg's charitable gift.   Transfer would clearly enhance the convenience of the parties and the interests of justice, and the Court should order it.

A.      **The Private Interest Factors Support Transfer**

The "private interest factors" are "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive."   *Volkswagen*, 371 F.3d at 203 (citation omitted).   Combined,

the first three factors compel a transfer here, including the "arguably most important" factors of witness availability and convenience.  *Busch*, 2006 WL 1222031, at * 5 (citing *LeBouef v. Gulf Operators, Inc.*, 20 F. Supp. 2d 1057, 1060 (S.D. Tex .1998)).

### 1.    *The relative ease of access to sources of proof supports transfer*

The sources of proof in this case are located almost exclusively in the District of Columbia, which weighs strongly in favor of transferring the case there.  The relative ease of access to sources of proof is an important component of the convenience analysis, even if rendered less significant by technology.  *Volkswagen*, 545 F.3d at 316 (holding that the district in which documents and physical evidence reside weighs in favor of transfer to that district).  When one party to a dispute possesses the "bulk" of the sources of proof, this factor weighs in favor of a transfer to the district where that party resides.  *See Busch*, 2006 WL 1222031 at *4; *Wells Fargo Bank NA v. Bank of America NA*, No. 3:10–CV–1825–L., 2010 WL 5287538, *2 (N.D. Tex. Dec. 23, 2010) (unpublished) (concluding the access to proof factor weighed in favor of a transfer when the "majority of documentary proof and the persons involved in the structuring of the MLPA and mortgage-backed securities transaction reside in or around New York, Connecticut, and North Carolina" all "significantly closer in proximity to New York than to Texas").

Here, Mr. Ginsburg's case concerns his long relationship with the University, which maintains books and records related to that relationship through multiple custodians.  (*See* App. at 9, Decl. of K. Conry ¶ 3 (identifying multiple departments and offices at Georgetown that would maintain documents and records relevant to Mr. Ginsburg's gifts, including the President's Office, Law Center Dean's Office, Board of Visitors, Law Center Office of Advancement, Georgetown University Office of Advancement, and the Edward Bennett

Williams Law Library, Law Library Archives).   To be sure, Mr. Ginsburg may have some discoverable evidence in his possession.   However, Georgetown almost certainly possesses the "bulk" of records and tangible things relevant to its decision not to name the Sport and Fitness Center for him.   Accordingly, as in *Busch*, this factor "definitively weighs in favor of transfer." 2006 WL 1222031, at *4.

### 2. The availability of compulsory process to secure attendance of witnesses is neutral

Whenever transferring a case would bring non-party witnesses potentially necessary for fair trial of the case who are outside of a parties' control under the subpoena power of the court to which the case is transferred, transfer is favored.  *See Wells Fargo*, 2010 WL 5287538, at *3. The key question is simply whether "compulsory process to secure the attendance of witnesses is *available*." *Id.*  Because the three potential non-party witnesses of whom Georgetown is aware at this time would not be subject to subpoena in either forum, this factor is neutral but certainly does not weigh against transfer. 1/

### 3. The costs of attendance for willing witnesses supports transfer

The cost of attendance, which is often regarded as the most important factor to be considered when deciding whether to transfer venue, overwhelmingly favors transfer to the District of Columbia.  *See Sargent v. Sun Trust Bank, N.A.,* 2004 WL 1630081, at *3 (N.D. Tex. July 20, 2004) (unpublished).

Cost of attendance focuses on the monetary and personal costs associated with being

---

1/     Georgetown has identified at least three material non-party witnesses: former Georgetown employees Mary Matheron, Paul Seifert, and Michael Goodwin.  Ms. Matheron and Mr. Seifert had substantial dealings with Mr. Ginsburg and the donor transactions at issue while they were employed at Georgetown.  Mr. Goodwin may also have had some contact with Mr. Ginsburg.  (App. at 11, Decl. of K. Conry ¶ 5.)  Georgetown understands that Ms. Matheron resides and works in New Haven, Connecticut, Mr. Seifert resides and works in Naples, Florida, and Mr. Goodwin resides and works in Oregon.  (*Id.*)

away from work, family, and community.  *Volkswagen* 545 F.3d at 317.  When witnesses must travel more than 100 miles, "the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled."  *Id.* (citation omitted).  Costs to non-party witnesses are weighed more heavily than to party witnesses, but when the vast majority of party witnesses live in a far-away forum this factor weighs in favor of transfer.  *See Busch*, 2006 WL 1222031, at *5 ("Other than himself and his wife, Busch has provided no evidence as to any other potential witnesses in the Northern District of Texas. Accordingly, consideration of convenience and cost to witnesses favors transfer."); *Hernandez v. Graebel Van Lines*, 761 F. Supp. 983, 989 (E.D.N.Y. 1991) (when all witnesses except for plaintiff and his two treating physicians resided in district to which transfer sought, that fact weighed strongly in favor of transfer).

Mr. Ginsburg's claims hinge on alleged representations Georgetown employees made to him on various occasions.  All the individuals specifically named in the Complaint are Georgetown employees: Kevin Conry, President DeGioia, and former Dean of the Law Center Judith Areen and former Dean of the Law Center Alexander Aleinikoff, who is presently on a leave of absence.  (*See* Compl. ¶¶ 8, 15, 23, 26, 30 (K. Conry); *id.* ¶¶ 15–16, 26, 28, 30 (President DeGioia); *id.* ¶¶ 15, 20, 23 (J. Areen); *id.* ¶¶ 15, 26, 28 (A. Aleinikoff).)  The same is true of the various unspecified "Georgetown Officials" the Complaint mentions.  (*Id.* ¶¶ 18, 22–24, 28, 30 ("Georgetown Officials").)  All of the individuals specifically named in the Complaint are likely to be called by one party or the other as witnesses in this case—a case in which, given the nature of claims and defenses, live testimony may be of paramount importance.  *Cf. Wells Fargo*, 2010 WL 5287538, at *3 ("[T]he court is mindful that video taped depositions are less preferred at trial than live testimony.").

All of these individuals reside in or near Washington, D.C., with the exception of Mr. Aleinikoff, who is currently in Switzerland. Holding trial in the Northern District of Texas would require each of the District of Columbia-area residents to travel 2,700 miles round-trip and would impose substantial burdens on their personal and professional lives. *See, e.g.*, *Stratmark*, 2010 WL 5106442 at \*4 (holding that distance from neighboring state Oklahoma would impose costs on witnesses and therefore weighed in favor of transfer); (App. at 8, Decl. J. Areen ¶ 4 (explaining that Professor Areen regularly teaches classes in the District of Columbia); *id.* at 11, Decl. K. Conry ¶ 6 (explaining that Mr. Conry is responsible for oversight of the Law Center's emergency management and public safety).) 2/ Holding the trial in Washington, D.C. would also be more convenient for Mr. Aleinikoff, both for various personal reasons and because his work typically brings him there 4 or 5 times per year. (*See* App. at 5, Decl. of A. Aleinikoff ¶ 5.) As for the convenience of President DeGioia, it goes without saying that requiring the heavily-scheduled President of a major University with a multitude of undergraduate and graduate schools to travel to Texas for trial would pose substantial burdens on him. *See Kirschner Bros. Oil, Inc. v. Pannill*, 697 F. Supp. 804, 807 (D. Del. 1988) (granting transfer in part because three key party witnesses worked and resided in the proposed transferee forum and that transferring the case would allow them to "pay greater attention to corporate business matters").

Granted, transferring the case to the District of Columbia would require one person (Mr. Ginsburg) to travel to the District of Columbia from Dallas or elsewhere. But denying a transfer

---

2/ According to Google Maps, it also appears that of the three potential non-party witnesses of whom Georgetown is aware, two of them—Ms. Matheron in Connecticut and Mr. Seifert in Florida—would have further to travel to trial were the case to remain in Texas and are more likely to be willing to testify in person at trial in the District of Columbia. Moreover, of the three, Ms. Matheron had the most interaction with Mr. Ginsburg, is therefore most likely to be a witness, and lives much closer to Washington, D.C. than to the Northern District of Texas. (*See* App. at 11, Decl. of K. Conry ¶ 5.)

would impose the same cost multiple times over on many current and former Georgetown employees. *See Busch*, 2006 WL 1222031, at *5. Transferring the case would prevent much of this unnecessary and asymmetric cost and would impose a relatively light burden on Mr. Ginsburg, who has regularly traveled to the District of Columbia for a number of reasons over the years, and for years even owned real property in the District of Columbia. *See Gootnick v. Lighter,* No. C 05-02787 SI, 2005 WL 3079000, *6 (N.D. Cal. Nov. 16, 2005) (unpublished) ("Plaintiffs argue that because two of the defendants are corporations, it would not serve justice to require plaintiffs to travel to Hawaii to litigate their claims. However, plaintiffs are both successful entrepreneurs who voluntarily entered into investment deals with the defendant and several Hawaiian development projects.").

Overall, the very important factor of witness convenience overwhelmingly favors transferring the case to the District of Columbia.

### B.     The Public Interest Factors Support Transfer

The "public interest factors" are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law." *Volkswagen*, 371 F.3d at 203 (citation omitted). Here, the first three factors all favor a transfer—the District of Columbia is less congested than the Northern District of Texas, this is in essence a local controversy between a D.C. University and one of its alumni, and a court in the District of Columbia is likely to be more familiar with applicable law.

### 1.   *Relative court congestion supports transfer*

When, as here, case statistics reveal that the court to which a transfer is requested is less congested than the court in which the case is pending, this factor will favor transfer.  *See Stratmark, Ltd. v. Cross Mediaworks, Inc.*, 3:10-CV-0780-L, 2010 WL 5106442, *5 (N.D. Tex. Dec. 14, 2010) (concluding that the factor weighed in favor of a transfer when proposed district to which the case would be transferred had more newly-filed, pending cases and actions per judgeship than present forum); *Busch v. Robertson*, 2006 WL 1222031, *6 (concluding the congestion factor weighed in favor of transfer when the proposed district to which the case would be transferred had reported fewer cases than the present forum).

Here, for the most recent twelve month period, the Northern District of Texas had approximately 289% more filings, 215% more cases pending, 3 fewer judgeships, and approximately 374% more civil filings and 269% more pending cases per judgeship than the District of Columbia.   *Compare* App. at 3, Texas Northern, U.S. District–Judicial Caseload Profile (reflecting 8,181 filings, 7,536 pending, 12 judgeships, 565 civil filings per judgeship, and 628 pending cases per judgeship), *with* App. at 2, District of Columbia, U.S. District Court–Judicial Caseload Profile (2,827 filings, 3,495 pending, 15 judgeships, 151 civil filings per judgeship, and 233 pending cases per judgeship).   Docket congestion in Dallas supports a transfer to the District of Columbia.

### 2.   *The local interests in deciding localized disputes at home supports transfer*

At core, this dispute is a local controversy about whether a Washington, D.C. university complied with a naming condition in a Gift Agreement that was negotiated in Washington, D.C. for the naming of a building built in Washington, D.C. for the benefit of the university's Washington, D.C. students, faculty, and staff.   Because local disputes are better decided where

they arise, this factor weighs in favor of transfer.

"[I]n cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only.  There is a local interest in having localized controversies decided at home." *Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 70 (D.D.C. 2003) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)).  Courts consider a number of factors to determine whether a dispute is local, *see id.*, ordinarily starting with the location of the alleged wrong or injury.  *Busch*, 2006 WL 1222031, at *6.  Georgetown acknowledges that Texas may have some interest in this case because Mr. Ginsburg is a Texas citizen.  *See, e.g.*, *Busch*, 2006 WL 1222031, at *6.  But for at least three reasons, that interest is attenuated here and this case is at bottom a local dispute centered in the District of Columbia.

First, the gravamen of Mr. Ginsburg's contract claim is that Georgetown failed to honor a condition to name for him a building located in the District of Columbia under a gift agreement primarily negotiated there.  *See Envtl., Safety & Health Consulting Services, Inc. v. Magnablend, Inc.*, No. CIV.A. 12-1751, 2012 WL 5493744, *2 (E.D. La. Nov. 13, 2012) (unpublished).  As such, the core injury about which Mr. Ginsburg complains occurred in the District of Columbia, which weighs in favor of transfer.  *See Frederick v. Advanced Fin. Solutions, Inc.*, 558 F. Supp. 2d 699, 705 (E.D. Tex. 2007) (concluding that this factor weighed in favor of a transfer when a "substantial portion" of any alleged breach of contract would have occurred in the requested transfer forum); *see also Koehring Co. v. Hyde Construction Co.*, 324 F.2d 295, 296 (5th Cir. 1963) (reversing district court's denial of transfer in part because the requested transfer was to the location of the alleged injury); *Magnablend, Inc.*, 2012 WL 5493744, at *2–3 (concluding that the public interest factor weighed in favor of transfer over plaintiff's objection that the

forum had an interest in protecting the contractual rights of its citizens when the contract arose out of services rendered in another district and the contacts and communications giving rise to the dispute occurred in the other district). 3/

Second, Mr. Ginsburg's claims are predicated upon an ongoing pattern of alleged misrepresentations on the part of Georgetown.  (*E.g.*, Compl. ¶ 30 ("Despite Georgetown's continued assurances . . . .")  Georgetown denies that it made any misrepresentations to Mr. Ginsburg.  But the majority of any representations Georgetown made to Mr. Ginsburg, however characterized, would have been made in the District of Columbia where the relationship between the parties was centered, and where, parenthetically, Mr. Ginsburg owned residential property from 2006 to 2010.  (*See* Countercl. ¶ 10.)  For example, Georgetown is aware of at least nine different meetings that have taken place in Washington, D.C. since 2000 between Mr. Ginsburg and just three of its employees.  (*See* App. at 4–5, Decl. of A. Aleinikoff ¶ 4 (describing 5 meetings with Mr. Ginsburg in the District of Columbia); *id.* at 7–8, Decl. J. Areen ¶ 3 (describing 6 meetings with Mr. Ginsburg in the District of Columbia); *id.* at 9–10, Decl. K. Conry ¶ 4 (describing 7 meetings with Mr. Ginsburg in the District of Columbia). 4/)  No doubt there were additional meetings in the District of Columbia during that period with other Georgetown employees.  This demonstrates not only the probable location of any alleged injury,

---

3/      The fundamental injury about which Mr. Ginsburg complains (the failure to name a building for him located in Washington, D.C.), the place where Mr. Ginsburg and Georgetown's relationship was centered (Washington, D.C.), and the nature of the transaction at issue (a charitable gift for the benefit of Georgetown's Washington, D.C. students, faculty, and staff), distinguish this case from one in which it is impossible to say the local interests of one forum or the other predominate.  *Cf. Sabre Technologies, L.P. v. TSM Exhibits, Inc.*, 3:09-CV-0392-L, 2010 WL 3855316 (N.D. Tex. Sept. 29, 2010) (unpublished) (concluding the "[alleged] injury arose from an ongoing series of transactions and [alleged] misrepresentations, making it impossible to conclude that local interests favor trial in one setting as opposed to another.").

4/      Typically more than one of the declarants met with Mr. Ginsburg in the referenced meetings.

but also that the District of Columbia has a strong interest in this case, and supports a transfer. *Cf. Doe v. Corp. of The Ass'n of the Presiding Bishop of The Church of Jesus Christ of Latter-Day Saints,* 08-CV-371-SU, 2009 WL 2132722, *4 (D. Or. July 10, 2009) ("Even though Plaintiff alleges in his Complaint that two instances of abuse occurred in Oregon, the Magistrate Judge correctly concluded Idaho has a more significant interest and relationship with this case.").

Third, Mr. Ginsburg seeks to recover a charitable donation given for the benefit of a known class of beneficiaries—Georgetown Law Center students, faculty, and staff—who are resident at Georgetown's campus in the District of Columbia. *Cf. TGI Friday's Inc. v. Great Nw. Restaurants, Inc.*, 652 F. Supp. 2d 750, 762–63 (N.D. Tex. 2009) (concluding that the local interest factor weighed in favor of a transfer where the dispute concerned restaurants located in the transferee forum because the services provided by the restaurants and commerce generated was of significant interest to that forum); *Sierra Club*, 276 F. Supp. 2d at 71 (concluding that Florida had a local interest in dispute over the EPA's issuance of mining permits in the Everglades).

In sum, this controversy concerns a Georgetown alumnus's claims that Georgetown failed to name a building situated in Washington, D.C. after him allegedly in violation of a condition of a gift he gave for the benefit of Georgetown and its students, faculty, and staff. This dispute is, at bottom, a District of Columbia controversy that should be tried in the District of Columbia. *Cf. U.S. ex rel. Thomas v. Siemens AG*, No. 1:04-CV-116, 2009 WL 1657429, *7 (D.V.I. June 12, 2009) (unpublished) (considering the relationship of the respective communities from which the jurors are required to serve to the occurrences giving rise to the case and concluding that the citizens of one state had the greater interest based on the "location of the headquarters of Defendant Siemens Medical Solutions USA, Inc., the residence and employment

of the many witnesses, and the primary location of the negotiation of the federal contracts at issue in that forum. Consequently, the citizens of that forum should bear the responsibility for jury duty").

### 3.      Familiarity of the forum with the law that will govern is neutral

Georgetown is confident that a court in either the Northern District of Texas or the District of Columbia is capable of applying the appropriate state law.  Thus this factor is neutral.

## CONCLUSION

For the foregoing reasons, defendant Georgetown University respectfully requests that this Court enter an order transferring this case to the United States District Court for the District of Columbia.

Dated: April 9, 2013

Respectfully submitted,

<u>          /s/ Bruce D. Oakley        </u>

William D. Nussbaum
D.C. Bar No. 941815
Joel D. Buckman
D.C. Bar No. 1003868
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
william.nussbaum@hoganlovells.com
joel.buckman@hoganlovells.com

*Of counsel*

Bruce  D. Oakley
State Bar No. 15156900
HOGAN LOVELLS US LLP
700 Louisiana Street
Suite 4300
Houston, TX 77002
Tel: (713) 632-1400
Fax: (713) 632-1401
bruce.oakley@hoganlovells.com

*Counsel for Defendant Georgetown University*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically on April 9th, 2013, in compliance with the Court's Standing Order Designating Case for Enrollment in the Electronic Case Files System, and has been served on all counsel by electronic service.


<u>     <i>/s/ Bruce D. Oakley</i>     </u>
Bruce D. Oakley
